# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| JASON JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.  3:16-cv-0819 |
| | ) | |
| BRUCE WESTBROOKS, Warden, | ) | Judge Aleta A. Trauger |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. The petitioner is serving a term of life imprisonment with the possibility of parole plus 25 years, to be served consecutively, imposed by the Wilson County Criminal Court on November 13, 2003, after a jury convicted the petitioner of first- and second-degree murder.  The respondent has filed an answer to the petition (ECF No. 16) stating that the grounds should be denied because they are not cognizable in federal habeas proceedings, are without merit and are procedurally barred.

The matter is ripe for review and the court has jurisdiction.  28 U.S.C. § 2241(d).  The respondent does not dispute that the petitioner's federal habeas petition is timely.  (ECF No. 16 at 2).  The respondent states that the federal habeas petition at issue here appears to be the petitioner's first application for federal habeas relief.  (*Id.*)

Because a federal court must presume the correctness of a state court's factual findings unless the petitioner rebuts this presumption with 'clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and because the issues presented can be resolved with reference to the state-court

record, the court finds that an evidentiary hearing is not necessary. *See Schriro v. Landrigan*, 550 U.S. 464, 474 (2007) (holding that if the record refutes a petitioner's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing (citing *Totten v. Merkle,* 137 F.3d 1172, 1176 (9th Cir. 1998))). Upon review and applying the AEDPA standards, the court finds that the petitioner is not entitled to relief on the grounds asserted. Accordingly, the petition will be denied and this matter dismissed.

I.     **PROCEDURAL BACKGROUND**

The state prosecution arose from the shooting death of Christy Waller, the victim, who was pregnant at the time of her death, and her fetus. On September 23, 2002, the petitioner was indicted by the Wilson County grand jury and charged with two counts of premeditated murder. Petitioner was tried before a jury beginning November 12, 2003 and concluding on November 13, 2003. At the conclusion of trial, on November 13, 2003, the jury found the petitioner guilty of first-degree premeditated murder and second-degree murder. (ECF No. 15-1 at 81-82.) That same day, the trial court imposed a life sentence for the first-degree murder conviction. (*Id.* at 81.) Following a sentencing hearing on January 15, 2004, the petitioner was sentenced to a consecutive term of 25 years imprisonment to be served at 100% for the second-degree murder conviction. (*Id.* at 82.)

The petitioner appealed his judgment of conviction to the Tennessee Court of Criminal Appeals ("TCCA"), which rejected all appellate arguments and affirmed the petitioner's convictions and sentences in an unpublished opinion issued on June 26, 2006. (ECF No. 1-1 at 1; *see also State v. Jason Curtis Johsnon*, No. M2003-03060-CCA-R3-CD; 2006 WL 407767, at *1 (Tenn. Crim. App. Feb. 17, 2006.) The petitioner filed an application for permission to appeal to the Tennessee Supreme Court, which was denied on June 26, 2006.

On May 16, 2007, the petitioner filed a petition for post-conviction relief in the Wilson County Criminal Court. On December 5, 2007, counsel was appointed to assist the petitioner, (ECF No. 15-14 at 76.), and on August 10, 2009, counsel filed an amended petition for post-conviction relief in the state court (ECF No. 15-14 at 82-123). The matter was heard on April 26, 2013, and on January 9, 2015, the state court issued an order denying relief. (ECF No. 15-14 at 144-148.)

The petitioner appealed to the TCCA, which denied relief on December 30, 2015. (*See Johnson v. State,* No. M2015-00258-CCA-R3-PC, 2015 WL 9581560, at *1 (Tenn. Crim. App. Dec. 30, 2015).) The petitioner did not apply for permission to the appeal to the Tennessee Supreme Court.

## II.  STATEMENT OF FACTS

The TCCA summarized the facts presented at trial as follows:

> For clarity in this opinion, Christy Waller will be referred to as the "victim," and her fetus as "the unborn child" or "fetus." James Damon Brock, Brian Hanna, and Jason Waller, the victim's husband, worked for Townsend Tree Service. Mr. Brock testified that he picked up Mr. Waller and Mr. Hanna, who lived at the Waller residence, between 4:30 a.m. and 5:00 a.m. on September 17, 2002. The three men were scheduled to meet the company's trucks in Williamson County at 6:00 a.m. Mr. Brock observed the victim and Mr. Waller kiss and hug before Mr. Waller got into the car. Mr. Brock parked and locked his car, a white Honda Accord, at the company's designated meeting place. Mr. Brock said that only his girlfriend, Rebekah Crutcher, had a duplicate key to the car, and the car was in the same spot when Mr. Brock returned to the parking lot at the end of the workday.
>
> Mr. Brock said that he and Mr. Hanna worked with the cutting crew, and Mr. Waller worked behind them with the chipper crew. As the day wore on, the chipper truck fell further and further behind the cutting truck. Mr. Brock said that he ate lunch with Mr. Waller from 12:15 p.m. to 12:30 p.m. Mr. Brock said that Mr. Waller drove his truck to the dump later that afternoon. Mr. Waller's truck had transmission problems, and a mechanic was dispatched to the dump site to fix the vehicle. Accordingly, Mr. Waller did not arrive back at the meeting place until 6:00 p.m. or 6:30 p.m.

3

Mr. Brock said that he drove back to Wilson County with Mr. Hanna and Mr. Waller, and the men stopped to visit a friend who lived about ten miles from the Waller residence. After visiting for approximately forty-five minutes, the three men bought something to drink at a market and then started toward Mr. Waller's home. Mr. Brock spotted Ms. Crutcher driving toward him. Ms. Crutcher turned her car around and caught up with Mr. Brock. Mr. Brock said that Ms. Crutcher was angry because the men were late getting home from work. Ms. Crutcher followed the men to the Waller residence.

The group did not see the victim when they arrived. Mr. Waller stayed in the front yard, and started calling people on a cell phone to see if he could find the victim. Mr. Brock said that Mr. Hanna entered the house first and returned with "space ship eyeballs." Mr. Hanna told Mr. Brock to come inside, and he led Mr. Brock into the bedroom where the victim was lying slumped against a closet door. Mr. Brock went outside and told Mr. Waller that something had happened to the victim, and Ms. Crutcher called 911.

Mr. Brock said that he was aware that Mr. Waller took drugs, but he did not think Mr. Waller had a serious drug problem. Mr. Brock said that he knew Defendant's name because Mr. Waller told him that Defendant was Mr. Waller's drug supplier. Mr. Brock said that he drove Mr. Waller to Defendant's house at some point before the shooting. Mr. Waller wanted to give Defendant some living room furniture as a partial payment of his outstanding drug debt. Mr. Brock helped Defendant load the furniture into Mr. Brock's truck. When they arrived at Defendant's apartment, Mr. Waller went inside. When Mr. Waller returned to the truck, he told Mr. Brock that they had to bring Defendant a recliner because Defendant was "not giving [him] nothing" for the furniture. The two men returned to Mr. Waller's house, loaded up the recliner, and returned to Defendant's apartment. Defendant was not home, so Mr. Waller left the recliner at the apartment building.

On cross-examination, Mr. Brock said that the front door was open when he, Mr. Hanna, and Mr. Waller returned to the Waller home. Mr. Brock estimated that about twenty minutes elapsed between the time Mr. Hanna discovered the victim's body and the 911 call.

Officer Chris Allison, with the Wilson County Sheriff's Department, arrived at the Waller residence at 8:32 p.m. Mr. Waller escorted Officer Allison to the body, and then Mr. Waller went back outside. Officer Allison did not notice a weapon at the crime scene. Detective Chris Hodge processed the crime scene. He found two unfired .357 bullet shells and one unfired 12-gauge shotgun shell in the victim's bedroom. Detective Hodge

testified that there were no signs of forced entry, and the door leading to the basement was locked. A single strand of brownish-blond hair was found in the victim's hand. Detective Hodge said that the hair was not submitted for testing, but it resembled the victim's hair. Detective Hodge acknowledged that Mr. Waller's hair was dark brown.

Megan Bartlett was subpoenaed as a State's witness. Ms. Bartlett and Ashley Vaughan were staying with Angela Hurd, when Defendant arrived at Ms. Hurd's apartment around 9:30 a.m. on September 17, 2002. Defendant borrowed Ms. Vaughan's black, two-door Saturn, and said, "I'm going to kill a bitch if I don't get my $900." Ms. Bartlett said that Defendant returned Ms. Vaughan's car around noon that day. On cross-examination, Ms. Bartlett said that Defendant did not mention any names, and that she had never heard Defendant threaten anyone before. Ms. Bartlett said that Defendant did not talk about the shooting with her.

Leah Mendoza was also subpoenaed as a State's witness. She testified that she talked to Defendant on September 18, 2002, and he asked her to tell the police that he had been at her house on September 17, 2002. Ms. Mendoza refused his request. Ms. Mendoza had heard rumors about the shooting of the victim. When she asked Defendant why he did it, Ms. Mendoza said that Defendant replied, "You know me. Business." Ms. Mendoza testified on cross-examination that she had never seen Defendant act violently or threaten anyone before.

Antonio Hardy testified that Defendant came to his house early on September 17, 2002, and retrieved a gun. Mr. Hardy said that Defendant returned to his apartment later that afternoon and muttered under his breath that "he [had] shot somebody." Krissy Foster, Mr. Hardy's girlfriend, said that Defendant returned to the apartment around one o'clock p.m. with Mr. Hardy's brother, Phillip, and asked her to wash his hair for him. Ms. Foster said that Defendant also asked Antonio Hardy for some clothes, but Mr. Hardy's clothes did not fit Defendant. Ms. Foster, too, heard Defendant say that he had killed someone.

Jason Locke, a special agent with the T.B.I., testified that he and the investigating officers searched for Defendant after the shooting but were unable to locate him. Wilson County Sheriff Terry Ashe held a press conference at the Wilson County Justice Center at 1:00 p.m. on September 22, 2002, asking for information about Defendant's whereabouts. The press conference aired on the five o'clock evening news. Agent Locke said that he received a call from the Sheriff's Department at 6:00 p.m. that Defendant had voluntarily arrived at the department.

Agent Locke said that Defendant was read his *Miranda* rights and signed a written waiver at 7:20 p.m. Agent Locke said that Defendant "was extremely cooperative, good attitude, smiling, making jokes." Agent Locke said that Defendant initially said that he had gone to Gallatin on September 17, 2002 to see family members. Defendant said that he had lived with Mr. Waller and the victim for a period of time, and Defendant was aware that the victim was pregnant.

Agent Locke said that he orally interviewed Defendant from 7:20 p .m. until approximately 11:45 p.m., with several breaks during this time frame. At approximately 11:45 p.m., Defendant said, "Okay, I shot the bitch." They took a break, and then Defendant gave a written statement. Defendant said in his written statement that Mr. Waller and the victim had bought cocaine from him for several months preceding the shooting. Defendant said that he had a good relationship with Mr. Waller until Mr. Waller accused Defendant of breaking into his house. After using drugs all night, Defendant said that he decided to borrow Ms. Vaughan's car and drive over to Mr. Waller's house on September 17, 2002, to confront Mr. Waller about his accusations. Defendant said he carried a .38 revolver with him. The victim opened the door when he knocked. Defendant said that the victim told him she ought to shoot him and started walking down the hall to her bedroom. Defendant said that the victim "walked toward her closet and I shot her. I thought I had missed, so I shot a second time. I don't remember shooting any more than that."

Defendant said that he threw the revolver off the Burton Road bridge, and then burned the clothes he was wearing at the time of the incident in the Inman Court projects. Defendant said that he was "high on drugs" when he shot the victim, and that he had forgotten that the victim was pregnant.

Agent Locke said that Defendant completed his first written statement at 1:09 a.m. on September 23, 2002. Agent Locke said that Defendant was relaxed, calm, and cooperative during the process. Defendant accompanied Agent Locke to the Inman Court projects, but they could not find any burn marks on the ground where Defendant said that he had burned his clothes. Defendant and Agent Locke then went to the Burton Road bridge, arriving at about 1:55 a.m.

After they returned to the Sheriff's Department, Agent Locke said that Defendant gave a second written statement at 2:34 a.m. in which he identified a blue bandanna, a pair of blue jeans shorts, a pair of Reebok shoes, and a Cricket cell phone bill as his property. In his statement, Defendant acknowledged that he might have been wearing the shorts and Reebok shoes when he shot the victim, but that he could not remember.

Defendant also said that he might not have burned the shorts as he had previously stated.

Agent Locke said that Defendant was read his *Miranda* rights again at 5:15 a.m. and he signed a written waiver. Defendant then gave a third written statement which concluded at 5:40 a.m. He stated that his girlfriend, Sherita Harrison, was with him when he shot the victim. Defendant said he was wearing the blue jean shorts and Reebok shoes when he shot the victim. He was also wearing a white tee shirt which Defendant later gave to Phillip Hardy for disposal. Defendant said he drove to his aunt's house in Lebanon after he shot the victim and borrowed some vice grips and a hammer. Defendant said he put his revolver and his aunt's tools in his father's shed until the following Saturday. He then broke the gun into pieces with the hammer, and threw the pieces one by one on Bluebird Road.

Detective Ricky Knight accompanied Defendant to Bluebird Road on September 23, 2002, but they were unable to locate any parts of Defendant's gun. Detective Knight read Defendant his *Miranda* rights, Defendant signed a written waiver, and Defendant gave a fourth written statement at 9:20 a.m. In his statement, Defendant said that he threw the gun's cylinder on the left side of a creek near Bethany Lane, and threw the barrel on the right side of the creek. Defendant stated that he could not remember where he threw the other pieces of the gun.

Dr. Donald Wayne Nuessle, the deputy medical examiner for Wilson County, received a report of the victim's shooting at 8:30 p.m. on September 17, 2002. Dr. Nuessle testified that when he arrived at the residence, he found the victim slumped against a closet door with what appeared to be a bullet wound to her forehead. Based on the victim's skin and body temperature, and the degree of rigor mortis, Dr. Nuessle estimated that the victim had died at approximately 1:00 p.m. that day, with a variance of one and one-half to two hours either way. Dr. Nuessle was unable to confirm that the victim was pregnant at the time of his examination because of the degree of rigor mortis.

Shelly Betts, a forensic scientist with the T.B.I., testified that she examined several fragments of two bullets retrieved from the crime scene. Agent Betts said that the two bullets had the same class characteristics, but there were not enough individual markings on the fragments to tell whether or not the bullets were fired from the same weapon. Agent Betts said that the two bullets could have been fired from either a .38 special or a .357 magnum.

Dr. John Gerber performed the victim's autopsy on September 18, 2002. Dr. Gerber testified that the victim's toxicology screen was clear of drugs. Dr. Gerber stated that the victim died of two bullet wounds to the head.

One bullet entered the left top of the victim's head, traveled downward and then backward and to the left. Bullet fragments were found in the temporal bulb at the base of the victim's brain. Dr. Gerber said that he could not detect the presence of stippling because of the victim's hair but there was soot present around the bone at the entry place of the bullet. The second bullet entered the victim's left forehead about three inches below the top of her head and traveled backward, down and to the right. The trajectory of both bullets was consistent with the weapon being fired from above the wound. Dr. Gerber said that stippling was present under the victim's eyes, the bridge of her nose, and her arm, indicating that the victim was holding her arm up when she was shot. Based on the stippling and soot around the victim's wounds, Dr. Gerber stated that the shooter was standing six inches to two feet away from the victim when he fired his weapon.

Dr. Gerber stated that the victim's female unborn child was twenty-three to twenty-four weeks old and showed normal internal and physical development. The fetus was viable and weighed 500 grams. The fetus' cause of death was asphyxiation from lack of oxygen in the victim's blood after the victim died of her gunshot wounds.

Mike Lamb, the victim's father, testified that the victim and Mr. Waller were experiencing financial difficulties even though the victim had recently inherited $250,000 from her grandmother. Mr. Lamb said that he lent the victim money to pay the arrearage on her mortgage payments because the bank was threatening foreclosure. Mr. Lamb said that one of the couple's cars had been repossessed. Mr. Lamp said that the victim and Mr. Waller had a prenuptial agreement.

The defense called Mr. Waller as a witness. Mr. Waller confirmed that he left home on September 17, 2002, between 5:00 a.m. and 5:15 a.m. with Mr. Brock. He said that he did not see Mr. Brock at work except at lunchtime. Mr. Waller said that he did not own a car at the time of the shooting because he had traded his car for drugs. Mr. Waller said that he owed money to a number of drug dealers, including Defendant and Phillip Hardy, but that he had never argued with Defendant over his outstanding debt to Defendant, and Defendant did not threaten him or ask for payment. Mr. Waller confirmed that he gave Defendant some furniture as partial payment of his debt. Mr. Waller said that the victim was going to receive an installment soon on her inheritance from her grandmother in the amount of $75,000, and Defendant gave Mr. Waller drugs on credit in anticipation of the inheritance. Mr. Waller said that nothing was taken from the house after the shooting.

In his written statement to the police, Mr. Waller said that he owed Defendant about $900.00 for the drugs he received from Defendant and

Phillip Hardy between February or March 2002, and June 2002. Mr. Waller said that Defendant accused him of "snitching" on Defendant in February or March 2002. Defendant told Mr. Waller he would kill Mr. Waller's children if Defendant was arrested. Mr. Waller told Defendant that he was not a snitch, and he would kill Defendant if he harmed his children. Mr. Waller said that those were the only threats Defendant ever made against him.

Mr. Waller said that on September 3, 2002, he and the victim heard noises in the basement. When they investigated, they found Defendant in the basement and Phillip Hardy hanging from a window. Defendant and Mr. Hardy accompanied Mr. Waller and the victim upstairs, and Defendant asked Mr. Waller about the debt. Mr. Waller said that the victim told Defendant she was going to find out soon how much money she was receiving from her grandmother's estate, and Defendant said to just call him when the money came in. Mr. Waller said that the incident was "no big deal."

Mr. Waller denied that he kept guns in the house but admitted that several gun cartridges were found on top of his bedroom dresser after the shooting. Mr. Waller said that the gun cartridges belonged to a friend. Mr. Waller said that he and the victim had discussed buying a gun for the house but had not done so at the time of the shooting. Mr. Waller said that he had seen Defendant carrying guns before.

On redirect examination, Mr. Waller said that he had given his car to Defendant in exchange for drugs. Mr. Waller said that Defendant did not keep up the car payments, and the car was eventually repossessed by the bank.

Thomas Carey, the victim's next door neighbor, testified that the Wallers were good neighbors until the summer of 2002. Mr. Carey said that people started arriving at the Wallers' residence at all hours of the night. Mr. Carey said that he and a neighbor across the street had items stolen from their property that summer. Mr. Carey stated that he heard someone shoot a gun off the Wallers' back deck approximately three weeks before the incident, and he called the police.

Deborah Carey testified that she drove by the victim's house some time before noon on September 17, 2002. She saw a small, white car parked in the driveway, but she did not see the victim.

The State called Adrian Dodd and Robert Britten as rebuttal witnesses. Mr. Dodd testified that he worked for Townsend Tree Service, and was working with Mr. Waller in Williamson County on September 17, 2002. Mr. Dodd

said that Mr. Waller was with him all day. They drove their truck to the dump around 2:00 p.m. The truck had transmission trouble, and Mr. Dodd returned to the job site around 2:45 p.m. after he called a mechanic. Mr. Dodd said that Mr. Waller arrived at the parking lot between 5:00 p.m. and 5:30 p.m. On cross-examination, Mr. Dodd said that he saw Mr. Brock at work on September 17, 2002, but not Mr. Hanna.

Mr. Brittern, also an employee at Townsend Tree Service, testified that Mr. Waller's truck broke down around 3:00 p.m. or 3:30 p.m. on September 17, 2002. Mr. Brittern said that Mr. Waller waited at the dump while Mr. Brittern worked on the truck for thirty or thirty-five minutes, and then Mr. Waller followed Mr. Brittern back to the parking lot. Mr. Brittern also stated that he saw Mr. Brock and Mr. Hanna at work that day.

*Johnson*, 2006 WL 407767, at *1–7.

The TCCA summarized the evidence presented at the post-conviction evidentiary hearing,[1] in pertinent part, as follows:

At the post-conviction hearing, the court admitted into evidence the deposition transcript of Dr. Feng Li. In that deposition, Dr. Li stated that he was present during the autopsy of Mrs. Waller and her fetus. In preparation for the deposition, Dr. Li had reviewed the autopsy report, Dr. Gerber's testimony, and tables Dr. Li commonly used to determine the gestational age of a fetus. Dr. Li concurred with Dr. Gerber's conclusion that Mrs. Waller's fetus was twenty-three to twenty-four weeks gestational age and weighed 500 grams. Dr. Li assumed that Dr. Gerber had relied on Mrs. Waller's clinical history when reaching his conclusion; however, Dr. Li did not know if Dr. Gerber relied on any of Mrs. Waller's medical records during the autopsy. Dr. Li explained that the most important factor for determining viability was the fetus's lungs. Dr. Gerber had noted that the lungs had three lobes on the right and two lobes on the left, which indicated to Dr. Li that the lungs were developing normally. Dr. Li stated that he could not determine whether the fetus was alive or dead at the time of Mrs. Waller's death just by examining the fetus. Dr. Li explained that, under the legal definition of viability, "any gestation age beyond [twenty-two] week[s] and above 500 grams is defined as viable." However, Dr. Li explained that it was not possible to determine whether any one individual fetus was viable because there were too many variables. Dr. Li admitted that a fetus's viability might be affected if the mother used drugs such as cocaine, but he could not say "which direction it would affect." On cross-examination, Dr. Li agreed with Dr. Gerber's testimony that the fetus was

---

[1] Both the trial court judge and the coroner who conducted the autopsy of the victim and her fetus had died by the time of the post-conviction evidentiary hearing.

"right at the edge, it could have survived, it could have not survived. It depends. 500 grams is a very critical point."

Appellate counsel testified that he did not recall raising on appeal the issues of the State's witness commenting on the Petitioner's right not to testify or the sufficiency of the evidence as to the viability of the fetus. Appellate counsel explained that he raised the issues that he thought were supported by the record and were raised in the motion for new trial. On cross-examination, appellate counsel noted that this court addressed the sufficiency of the evidence regarding the viability of the fetus on direct appeal and determined that there was sufficient evidence to support the Petitioner's conviction for second degree murder.

Lieutenant Detective Ricky Knight testified that he participated in the investigation of Mrs. Waller's death. Detective Knight also admitted that he was the half-brother of one of the witnesses in the case, Leah Mendoza.
During the investigation, Detective Knight learned from his father that Ms. Mendoza wanted to talk to Detective Knight about the case. Detective Knight notified his supervisor, and his supervisor spoke with Ms. Mendoza. Detective Knight stated that he had not seen Ms. Mendoza's statement wherein she claimed that Detective Knight threatened to have her "locked up" if she did not cooperate with the police. Detective Knight denied making such threat. Detective Knight read a portion of Ms. Mendoza's testimony from the trial where she said, "Well, Friday they called my house and said that they was tired of playing games with me and if I didn't pick my subpoena up, they were going to lock me in jail until the court date. That's what my brother told my stepmother." Detective Knight denied threatening Ms. Mendoza by way of her stepmother.

* * *

Trial counsel spoke with Ms. Mendoza "at length" before trial. During cross-examination of Ms. Mendoza, trial counsel was able to bring out a number of inconsistencies between her testimony and her prior statements. Trial counsel also noted that Antonio Hardy had provided two statements to police; in the first he simply stated that the Petitioner was at Mr. Hardy's home on the day of the offense, but the second statement included more details about the Petitioner washing his hair, the presence of a gun, "and that kind of stuff." Trial counsel noted that the statements differed from each other. Trial counsel could not recall whether Mr. Hardy had an agreement with the State for his testimony. However, trial counsel stated that Mr. Hardy was threatened with losing his children and that Mr. Hardy "changed his story on cross that he had never seen a gun." . . . Trial counsel recalled that Krissy Foster, Mr. Hardy's girlfriend, also testified

inconsistently with her police statement. However, trial counsel did not think that he presented her contradictory statements to the jury.

* * *

Trial counsel recalled that Tennessee Bureau of Investigations Special Agent Jason Locke made a comment during his testimony that the Petitioner would have an opportunity to take the stand and testify. Trial counsel explained that he did not object to Agent Locke's comment or ask for a curative instruction because, at the time the comment was made, trial counsel believed the Petitioner was going to testify. According to trial counsel, the Petitioner was going to testify that he had an eighth-grade education and that he did not make the statements to police freely and voluntarily. Trial counsel noted that the Petitioner's testimony was a crucial part of their defense theory. The Petitioner had told trial counsel that he intended to testify, and he did not indicate differently until the last day of trial. At that point, the Petitioner decided not to testify because "his mother had convinced him that if [trial counsel] put him on the stand that the [S]tate was going to cross him up," so he elected not to testify.

Trial counsel acknowledged that the prosecutor . . . commented during closing that the victim was begging for her life. Trial counsel admitted that he did not object to these statements. He noted that the prosecutor's comment about the victim's begging for her life was consistent with the evidence of the bullet trajectory and that she was shot while she was on her knees with her arms in front of her face.

Trial counsel did not recall whether he obtained Mrs. Waller's medical records or if he asked Dr. Gerber whether he relied on Mrs. Waller's medical records when forming his opinion about the viability of the fetus. Trial counsel stated that "there was no way any doctor could conclusively testify beyond a reasonable doubt" that the fetus could have survived outside the mother's body. Trial counsel recalled that Dr. Gerber testified that the fetus would have been considered viable. Trial counsel did not object to this testimony, but during cross-examination, trial counsel got Dr. Gerber to admit that there was no way to determine conclusively whether the fetus was viable. Trial counsel explained that he did not call a defense expert witness about viability because he did not think it was necessary.

Trial counsel stated that there were two unidentified hairs found on Mrs. Waller's body—one on her shirt and one in her hand. Those hairs came from a Caucasian individual and were consistent in length and color to Mr. Waller's hair. Trial counsel consciously elected not to have the hairs tested because there was also a possibility that they were Mrs. Waller's hairs. If the test results revealed that they belonged to Mrs. Waller, then trial counsel

could not argue that the hairs had come from Mr. Waller. Trial counsel "thought the value of not knowing was far greater . . . than the probability or possibility that the hair could have actually belonged to the victim herself, and if that was the case, it just kind of undermined our entire theory all together."

Trial counsel stated that Agent Locke testified as to the existence of blood spatter at the scene. However, trial counsel did not believe Agent Locke gave any testimony about the trajectory of the bullet based on the blood spatter. If Agent Locke had given expert testimony of that sort, trial counsel would have objected.

* * *

Additionally, in order for the defense theory to be successful, trial counsel acknowledged that the Petitioner would have had to take the stand and deny all the statements he made to police and other individuals.

* * *

The Petitioner [testified] that Agent Locke's trial testimony—that the Petitioner said, "I shot the b* * * * "—was false. The Petitioner explained: The reason I had so many different statements was because [Agent] Locke kept on telling me that what I was saying was not consistent with the evidence, so I would change it up to tailor whatever he said. . . . The only reason why I had so many inconsistent statements is because I really did not know what was going on. The only reason why I made the statement in the first place—the only one reason why I made that statement was because I thought it was in my best interest.

* * *

The Petitioner stated that he was "undecided" about whether he was going to testify at trial. Trial counsel told him it was in his best interest to testify, but the Petitioner was worried about his lack of education. He said he "didn't want to get twisted up and turned around and it hurt me more that it help me," so he decided not to testify. The Petitioner claimed he told trial counsel that he was not going to testify before the trial began.

* * *

The Petitioner claimed that he confessed to the crime "under threatened coercion" and "under manipulation and trickery" but not voluntarily. When asked about how he was tricked into making statements to other witnesses, the Petitioner noted that Mr. Hardy said in his first statement that he had not seen the Petitioner on the day of the offense and that Mr. Hardy did not

know anything about the crime. The Petitioner claimed that Mr. Hardy implicated the Petitioner under police pressure. Similarly, the Petitioner said Ms. Foster originally told police that she had "told [the Petitioner] to wash his own hair," but she changed her story and said she washed his hair after "they get to talking about taking her baby away[.]" As to Ms. Mendoza, the Petitioner claimed, "[T]hey twisted this woman up to the point to where she was tore all to pieces on the stand. They made her say stuff that she didn't even put in her original statement." Regarding the statement he supposedly made to Megan Bartlett, the Petitioner said that he and Ms. Bartlett were not on good terms "because of a personal relationship," and he thought that may have motivated her testimony. The Petitioner denied saying anything about killing someone over $900. He also stated that he did not have reason to kill Mrs. Waller because "a dead person does not pay."

\* \* \*

*Johnson*, 2015 WL 9581560, at \*2–10.

## III.    ISSUES PRESENTED FOR REVIEW

In his *pro se* petition, the petitioner raises the following grounds for relief:

A.  Petitioner's Fifth and Fourteenth Amendment rights were violated when the trial court denied Petitioner's motion to suppress his statements to the police;

B.  The trial court violated Petitioner's Sixth Amendment right to a fair trial when it failed to exclude an autopsy photograph of the victim's fetus;

C.  The evidence was insufficient to support Petitioner's convictions;

D.  Trial counsel rendered ineffective assistance of counsel by failing to: (1)(a) cross-examine witnesses Antonio Hardy and Krissy Foster regarding inconsistent statements they gave to law enforcement officers, and  (b) interview Megan Bartlett, Leah Mendoz and Antonio Hardy regarding threats to testify; (2) to object to TBI Agent Locke's testimony about blood spatter evidence; (3) to test a hair found in the victim's hand for DNA evidence; (4) object to the State's comments about Petitioner's failure to testify at trial; (5) object to the State's closing argument regarding (a) proof that the fetus was viable, (b) the victim's posture and statements before she was shot; (c) Petitioner's alleged statement to Agent Locke; (6) offer evidence to establish that the fetus was not viable or to preserve the issue for appeal;

E.  The cumulative effect of the errors in the trial court deprived Petitioner of his right to a fair trial

(ECF No. 1.)

IV.     **STANDARD OF REVIEW**

This matter is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).   AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011).   "AEDPA requires heightened respect for state court factual and legal determinations."  *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).   "State-court factual findings  . . .  are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence."  *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009).   AEDPA prevents federal habeas "retrials" and "ensure[s] that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).   It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."  *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly

established, this court may not rely on the decisions of lower federal courts. *Lopez v, Smith*, 135 S. Ct.1, 4 (2014); *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644-45 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see Burt v. Titlow*, 134 S. Ct. 10, 16 (2013); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Indeed. "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015).

Under AEDPA, 28 U.S.C. § 2254(d):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Davis v. Ayala*, 135 S. Ct. at 2198; *see also White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.') (internal citation omitted).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court cases, or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from United States Supreme Court decisions but unreasonably applies it to the facts of the particular case. *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

## V.     DISCUSSION

### A.  Motion to Suppress

The petitioner asserts that the trial court violated his Fifth and Fourteenth Amendment rights in denying his motion to suppress the statements he gave to police. He argues that his statements were not the result of voluntary and knowing waivers of his rights against self-incrimination. On direct appeal, the TCCA summarized the facts presented at the hearing on the petitioner's motion to suppress his statements to the police as follows:

Agent Locke testified that Defendant voluntarily came to the Wilson County Sheriff's Department in response to a televised press conference conducted by Sheriff Ashe on September 22, 2002. Agent Locke said that Defendant arrived at the Sheriff's Department around 6:00 p.m., and he arrived at approximately 7:00 p.m. Agent Locke read Defendant's *Miranda* rights to him, and Defendant signed a written waiver at 7:20 p.m. Agent Locke said that Defendant did not appear to be under the influence of any drugs, and appeared to understand the process, including the waiver of his *Miranda* rights.

On cross-examination, Agent Locke said that he offered to either videotape the taking of Defendant's statements, or take his statements on the computer, and Defendant chose the computer. Agent Locke said that Defendant never requested the assistance of counsel. Agent Locke outlined the various breaks and interviews that occurred during the thirteen-hour interview process. At 7:20 p.m., Agent Locke began the initial interview. Defendant was given the opportunity to use the restroom and smoke a cigarette at 8:15 p.m. Agent Locke also gave Defendant a cup of coffee. The interview continued from 8:30 p.m. until 9:05 p.m. when Defendant took another break and was provided a soft drink. Agent Locke interviewed Defendant from 9:17 p.m. until 10:45 p.m. when Defendant took a restroom break. Agent Locke then interviewed Defendant from 10:48 p .m. until 11:45 p.m. when Defendant made his first incriminating statements. They took a five-minute break, and then prepared Defendant's first written statement until Defendant took a break at 12:45 a.m. The break lasted about ten minutes, and Defendant's first written statement was concluded at 1:09 a.m.

Defendant agreed to accompany the officers to the Inman Court projects, and they arrived at that destination at 1:30 a.m. The officers and Defendant then traveled to Burton Road at Defendant's direction, arriving at approximately 1:55 a.m. The officers discussed certain discrepancies in Defendant's statement as they drove back to the justice center. Defendant gave a second written statement identifying some clothes found by the sheriff's department as the clothes he wore when he shot the victim. The second written statement was concluded at 2:34 a.m.

Agent Locke said that between 2:34 a.m. and 5:05 a.m., he and other officers interviewed Ms. Harrison and obtained her written statement at approximately 3:59 a.m. Agent Locke said that he went to talk to Defendant during a break in Ms. Harrison's interview, and Defendant was asleep. Agent Locke read Defendant his *Miranda* rights again at 5:15 a.m., and Defendant signed a third written statement at 5:40 a.m.

Agent Locke testified that he followed normal procedures in preparing Defendant's written statements. Agent Locke read each statement out loud to Defendant as he typed, giving Defendant the opportunity to make any changes. Agent Locke printed out the statement once it was completed and read it to Defendant a second time. Any changes were made, and Defendant read the statement again before he signed it. Agent Locke denied that he had promised Defendant a reduced charge in exchange for his statement.

Detective Knight testified that he read Defendant his *Miranda* rights at 9:20 a.m. on September 23, 2002, and Defendant signed a written waiver. Defendant appeared to understand the process and did not ask any questions about his statement or the waiver of his *Miranda* rights. Detective Knight, Defendant, and Detective Chris Hodge drove to the Bluebird Road area at 9:25 a.m., arriving at the bridge on Bethany Road at 10:25 a.m. They returned to the police station at 10:30 a.m.

At the conclusion of the hearing, the trial court found that Defendant's statements were "lawfully obtained" and denied his motion to suppress.

*Johnson*, 2006 WL 407767, at *8-9. Relying on the broader protections provided by the Tennessee Constitution and considering the totality of the circumstances surrounding the petitioner's interrogation, the TCCA denied the petitioner's motion to suppress, concluding that "the evidence does not preponderate against the trial court's finding that Defendant voluntarily and knowingly waived his right against self-incrimination and voluntarily gave his statements concerning the killing of the victims." *Johnson*, 2006 WL 407767, at *8-9.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self-incrimination, when an individual is in custody, law

enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478-79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). Even so, "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good . . . . Admissions of guilt resulting from valid *Miranda* waivers are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Texas v. Cobb*, 121 S. Ct. 1335, 1342 (2001) (quotation and citation omitted). The cases in which a defendant can make a colorable argument that a confession was compelled despite the fact that law enforcement authorities adhered to *Miranda* are rare. *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (citation omitted).

When a criminal defendant claims that his confession was rendered involuntary by police coercion, the court must inquire whether, considering the totality of the circumstances, the conduct of law enforcement officials overbore the will of the accused. *See Mincey v. Arizona*, 437 U.S. 385 (1978); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). A suspect's state of mind, standing alone, cannot render a statement involuntary. Rather, coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *See Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986). Typically, findings of coercive police conduct involve brutality or threats of physical coercion. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) (threats of physical violence); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant interrogated for eighteen hours without food or sleep while on medication); *Beecher v. Alabama*, 389 U.S. 35 (1967) (gun held to head of wounded suspect to extract confession); *Cooper v.*

*Scroggy*, 845 F.2d 1385 (6th Cir. 1988) (officer struck defendant, failed to take steps to change coercive environment, and other detective threatened defendant). Nevertheless, a confession may be rendered involuntary if it is the product of psychological pressure or coercion sufficient to overbear the will of the accused. *See Fulminante*, 499 U.S. at 287-88. Among the circumstances to be reviewed by the habeas court are "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition and mental health." *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (citations omitted).

There is no evidence to support the petitioner's claim that his confession was involuntary. Rather, the evidence established that petitioner voluntarily turned himself into the police, he was given his *Miranda* warnings orally and in writing on multiple occasions, he was given comfort breaks and refreshments, he remained calm and cooperative, he slept for some period of time, and he twice accompanied law enforcement officers on trips outside the station to look for evidence.[2] (Tr. I at 34-35.) Additionally, Agent Locke read the petitioner's confession out loud to the petitioner as it was being typed, and after it was completed Agent Locke read the statement aloud to the petitioner and then gave it to the petitioner to read himself. (*Id.* at 36.)

Agent Lock and Lieutenant Knight testified that the petitioner appeared to understand his *Miranda* rights and the interview process, and that he did not appear to be under the influence.

_____

[2] The trial transcripts will be referred to as follows:
  "Tr. I" – Pre-Trial Motion, Transcript Volume I, ECF No. 15-2
  "Tr. II" – Trial Transcript,  Volume II, ECF No. 15-3
  "Tr. III" – Trial Transcript,  Volume III, ECF No. 15-4
  "Tr. IV" – Trial Transcript,  Volume IV, ECF No. 15-5
  "Tr. V" – Trial Transcript, Volume V, ECF No. 15-6

Exhibits from the trial are referenced as follows: "Exh." – ECF No. 15-7.

(*Id.* at 30.)  Additionally, Agent Locke asked the petitioner if he was "on anything," to which he responded "No."  (*Id.*)  Finally, Agent Locke testified that he did not make any promises or any deceptive or untrue statements to the petitioner.  (*Id.* at 37.)

Based on the foregoing, the state court's conclusion that the petitioner's confession was knowing and voluntary was not objectively unreasonable nor did it result in a decision that was contrary to clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).  The petitioner, therefore, is not entitled to relief on his first habeas claim.

### B.  Autopsy Photograph

The petitioner claims that the trial court violated his Sixth Amendment right to a fair trial when it failed to exclude an autopsy photograph of the victim's fetus.  He argues that the photograph was irrelevant and unfairly prejudicial under the Tennessee and Federal Rules of Evidence.

The TCCA concluded that the trial court did not err in admitting the evidence because "the photograph, although naturally disturbing, is not particularly gruesome, and the probative value of the photograph is not substantially outweighed by the danger of unfair prejudice." *Johnson*, 2006 WL 407767, at *10.

To the extent that the petitioner claims that the trial court erred in admitting the autopsy photograph of the fetus, his claim is not cognizable in these federal habeas proceedings.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-

68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

To the extent that the petitioner claims that the admission of the autopsy photograph of the fetus violated his right to a fair trial his claim must likewise fail. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if the petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). The petitioner has not met this difficult standard.

The petitioner was not denied a fundamentally fair trial by the admission of an autopsy photograph of the victim's fetus. According to the state court record, outside the presence of the jury, the trial court heard from Dr. Gerber, the medical examiner who conducted the autopsy of the victim and her fetus, regarding the photographs he intended to use in connection with his testimony. Dr. Gerber selected three photographs of the fetus, all three of which the trial court ruled were admissible; however, only one photograph was admitted into evidence at trial. (Tr. III at 238-39; Exh. At 76.) The photograph depicts the victim's dead fetus. (Exh. at 76.) As the

TCCA accurately noted, the fetus does not appear bloody or disfigured. (*Id.*) To be sure, viewing the photograph is uncomfortable. However, the photograph was not unduly prejudicial and was relevant to illuminating trial testimony regarding the viability of the victim's fetus. The Sixth Circuit and other Circuit Courts have found no due process violation in far more extreme cases involving photographs of murder victims. *See, e.g. Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (holding that admission of photographs depicting murder victim's severed head, her severed head held near her torso and severed breast, and her torso with her severed head and severed breast replaced on torso, did not deprive defendant of fair trial, and thus did not warrant federal habeas relief); *see also Villafuerte v. Lewis*, 75 F.3d 1330, 1343 (9th Cir. 1996) (photos relevant to prove that defendant knowingly restrained the victim); *Thornburg v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005) (no due process violation where petitioner challenged the admission of six photographs "depicting the charred remains of the victims' bodies"; despite the fact that the petitioner did not dispute the manner of death, "the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events"); *Willingham v. Mullin*, 296 F.3d 917, 928–29 (10th Cir. 2002) (denying claim that the admission of 22 photos of the murder victim's body was so unduly prejudicial as to render his trial fundamentally unfair, where photos relevant to issue of intent). Accordingly, the petitioner cannot establish a due process violation arising from the admission of the autopsy photograph of the victim's fetus. Consequently, the state court decision denying relief was not objectively unreasonable and the petitioner's second ground for federal habeas relief must be denied.

### C. **Sufficiency of the Evidence**

The petitioner claims that the evidence adduced at trial was insufficient to support his convictions. He argues that no evidence, other than his confessions, tied him to the crimes, and he questions the credibility of the State's witnesses at trial.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id*. Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the . . . [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). (en banc) (quoting Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who

seek habeas relief on sufficiency-of-the-evidence grounds. *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The TCCA set forth the governing state laws as follows:

> As relevant here, first degree murder is defined as "a premeditated and intentional killing of another." Tenn.Code Ann. § 39-13-202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). A finding of "premeditation" requires that:
>
>> the intent to kill must [be] formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
>
> Id.
>
> Motive is not an essential element of first degree premeditated murder. See id. § 39-13-202(a)(1).
>
>       \*   \*   \*
>
> "[T]he element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing." *State v. Thompson,* 43 S.W.3d 16, 522 (Tenn. Crim. App. 2000) (citing *Bland*, 958 S.W.2d at 660). In *Bland*, our Supreme Court listed several circumstances which may demonstrate the presence of premeditation, including "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citations omitted).
>
>       \*   \*   \*
>
> Second degree murder is defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). The term "another" includes a viable fetus. The "knowing" *mens rea* for second degree murder requires proof that the defendant is "aware that his or her conduct is reasonably certain to cause death." *State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App.2002); *see also* Tenn. Code Ann. §§ 39-11-106(a)(20), -302(b).

*Johnson*, 2006 WL 407767, at *11-12.

The TCCA set forth the evidence in support of the petitioner's first-degree murder

conviction as follows:

> In the case *sub judice*, Mr. Brock testified that he was aware that Mr. Waller
> had a drug problem, and that he had accompanied Mr. Waller before the
> shooting when Mr. Waller delivered some furniture to Defendant in partial
> payment of his outstanding drug debt to Defendant. Mr. Waller said that he
> owed Defendant $900.00 at the time of the victim's shooting, and that
> Defendant had fronted Mr. Waller drugs for some months prior to the shooting
> in anticipation of the victim's receipt of an inheritance. Ms. Bartlett testified
> that Defendant arrived at Ms. Hurd's house on September 17, 2002 to borrow
> Ms. Vaughan's car and said that Defendant stated he was "going to kill a bitch
> if [he did not] get [his] $900.00." Ms. Mendoza testified that she asked
> Defendant why he shot the victim, and defendant responded, "Business."
> While Mr. Waller testified that Defendant did not threaten him because of the
> outstanding debt, any conflicts in the testimony were resolved by the jury.

> Mr. Waller testified that Defendant had broken into his home shortly before the
> incident. Mr. Waller also described a previous altercation with Defendant
> when Defendant accused Mr. Waller of "snitching" on him and threatened to
> harm Mr. Waller's children. In his written statement to the police, Defendant
> said that he had a problem with Mr. Waller because Mr. Waller accused
> Defendant of breaking into his house and described his encounter with the
> victim as follows:

>> I asked [the] victim about the shit [Mr. Waller] was talking
>> about, and [the victim] started talking about me breaking in
>> the house. This was on the way walking back to her
>> bedroom. [Ms. Harrison] stayed in the living room. When
>> [the victim] and I were in her bedroom, I shot her twice. I
>> thought I missed the first time, and I shot her again.

> Dr. Gerber testified that the victim died as a result of two gunshot wounds to
> her forehead and the top of her head. Dr. Gerber stated that the bullets'
> trajectory was consistent with the shooter standing above the victim when he
> fired his weapon, and there was stippling on the victim's arm consistent with
> the victim holding her arm up as a defensive gesture. Mr. Hardy testified that
> Defendant came over to his apartment early on September 17, 2002 and
> retrieved a gun. Defendant stated in his written statement that he hid his gun in
> his father's shed until Saturday, September 22, 2002, when he broke the gun
> into pieces and threw the pieces separately out his car window.

*Id.* Relying on the standard set forth in *Jackson*, the TCCA rejected the petitioner's claim concluding that, with respect to the petitioner's first-degree murder conviction,

> the evidence was sufficient to establish premeditation and intent in the killing of Christy Waller. The fact that some of the State's witnesses expressed reluctance in appearing at trial goes to the credibility of their testimony. We conclude that a reasonable jury could conclude beyond a reasonable doubt that Defendant was guilty of first degree premeditated murder.

*Id.* at *12.

The TCCA likewise concluded that the evidence was sufficient to support the petitioner's conviction for second-degree murder of the victim's fetus, stating,

> Dr. Gerber testified that the victim was approximately six months pregnant, and, based on the photographs admitted at trial, the victim's pregnancy was clearly visible. Defendant stated in his written statement to the police that he had stayed overnight at the Waller residence before the shooting, and Mr. Waller testified that Defendant had been to his house several times and interacted with the victim. Agent Locke testified that Defendant knew the victim was pregnant. Defendant admitted in his written statement that he knew the victim was pregnant but, when he shot her, he "had forgotten" about the pregnancy. Defendant shot the victim once at close range, and then shot her a second time because he thought he had missed the first time.

> Dr. Gerber testified that the fetus weighed 500 grams and had developed normally both internally and externally. Dr. Gerber stated that although the fetus might have required some artificial assistance if born at this stage of development, the fetus was capable of sustaining life outside the wo[mb]. Dr. Gerber testified that the fetus died as a result of lack of oxygen in the blood when the victim died.

> Based on the foregoing, we conclude that the evidence was sufficient to support Defendant's conviction of the second degree murder of the victim's fetus.

*Id.*

There was sufficient evidence from which the jury could find that the petitioner formed the intent to kill some time prior to driving to the victim's home and shooting her. Disregarding

for the moment, the petitioner's multiple confessions, the evidence established that the petitioner obtained a gun from Antonio Hardy's home in the early morning hours of September 17, 2002, (Tr. III at 222), that the afternoon of September 17th Hardy and Krissy Foster heard the petitioner say he shot someone, (*Id.* at 223, 230), that the petitioner asked Foster to wash his hair and he asked Hardy for a change of clothes, (*Id.*), that Megan Bartlett heard the petitioner say he was going to kill "a bitch" if he did not get his $900, (Tr. II at 171), and that on September 18, 2002, the day after the murders, the petitioner spoke with Leah Mendoza, asked her to lie about his whereabouts on September 17th, and after she asked him why "he did it" he replied "Business." (Tr. III at 215-16.)

Moreover, as the state court noted, motive is not an element of the offense, but it may be considered in determining premeditation or intent. Here, the evidence established that ample motive existed given the outstanding drug debt Waller owed the petitioner, Waller's accusation that the petitioner had broken into his house and Waller and the petitioner's altercation regarding whether Waller was a snitch (Tr. III at 295, 301; *see also* Exh at 74-75.)

Finally, the petitioner's argument that the testimony of the State's witnesses should not be believed because they were subpoenaed to appear and did not appear voluntarily and, because Mendoza and Hardy were threatened by law enforcement if they failed to appear and testify, is unavailing. First, issues of credibility may not generally be reviewed by the habeas court. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (recognizing that a reviewing court does not reweigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court); *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992) (noting that it is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony); *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000) (providing that an

assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims, and thus, the mere existence of sufficient evidence to convict generally defeats a petitioner's claim.)[1]

Second, even accepting as true Mendoza's and Hardy's testimony that law enforcement officers threatened them,[3] the petitioner does not argue, and neither Mendoza nor Hardy suggest, that law enforcement officers threatened them in an effort to get them to testify untruthfully. (*See* Tr. III at 217 (Mendoza testimony that Lieutenant Knight was her brother and that he told her if she "didn't pick [up] my subpoena they were going to lock me in jail until [the] court date"); *Id.* at 226-27 (Hardy testimony that "if we [presumably referring to Foster] didn't cooperate or have no cooperation or either tried to hide anything, or lie, . . . they would take my son and put me in jail if I lied.").

With respect to the petitioner's second-degree murder conviction, the TCCA finding that the evidence at trial was sufficient to support the petitioner's conviction was patently reasonable. The evidence at trial established that the petitioner knew the victim was pregnant, and that the fetus' weight, internal and external development were sufficient to sustain life. *See* Tr. III, 182 (Locke testimony that the petitioner stated that he was aware that the victim was pregnant); Tr. IV 265-69 (Dr. Gerber testimony regarding the autopsy of the victim's fetus and death caused by lack of oxygen due to victim's death.)

---

[1] It should be noted that the petitioner's argument that because the many State's witnesses who considered him a friend testified only because they were subpoenaed, and did not come to court to testify voluntarily, works against his interest. As one appellate court observed in considering the credibility of the testimony of a defendant's friend, "One does not have to hold a degree in psychology to recognize that a witness may be reluctant, in the presence of a close friend, to say the words which may send the friend to prison for the remainder of his life." *Simpson v. United States*, 877 A.2d 1045, 1049 (D.C. 2005).

[3] At the hearing on the petitioner's state post-conviction petition, Knight denied threatening Mendoza. (Post-conviction Transcript at 27-28.)

In sum, the evidence presented at trial was sufficient to support the petitioner's convictions for first- and second-degree murder. Thus, the state court's decision was objectively reasonable and petitioner is not entitled to relief on his insufficiency of the evidence claim.

D. **Ineffective Assistance of Trial Counsel**.

The petitioner argues that his trial counsel was ineffective for a number of reasons. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v.*

31

*Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficult of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

(1)(a) Failure to Cross-Examine

The petitioner argues that trial counsel failed to cross-examine witnesses Antonio Hardy and Krissy Foster regarding inconsistent statements they gave to law enforcement officers. Expressly relying on the standard set forth in *Strickland*, in ruling on the petitioner's appeal of the trial court's order denying his post-conviction petition, the TCCA concluded that trial counsel was not ineffective, because:

> trial counsel testified that he did cross-examine each witness and was able to identify some inconsistencies between their testimony and their prior statements. Further, the Petitioner bears the burden of proving all factual allegations by clear and convicting evidence. *Jaco* [*v. State*,] 120 S.W.3d 828, 830 (Tenn. 2003). The witnesses' prior statements were not included in the record for the direct appeal or for this appeal. Accordingly, we are unable to determine what the witnesses said in their prior statements, outside of the limited testimony about their contents, and we cannot determine whether they were inconsistent with the witnesses' trial testimony. Therefore, the Petitioner has failed to establish that trial counsel was deficient for failing to cross-examine the witnesses about these statements or that he was prejudiced by that deficiency.

*Johnson*, 2015 WL 9581560, at *15.

"A defendant's right to cross-examination is an essential safeguard of fact-finding accuracy." *Higgins v. Renico,* 470 F.3d 624, 634 (6th Cir. 2006). Cross-examination "is 'the

principal means by which the believability of a witness and the truth of his testimony are tested.'" *Id.* (quoting *Davis v. Alaska,* 415 U.S. 308, 316 (1974)). *Strickland* requires that "trial counsel's performance must be judged on the facts of the case, viewed from counsel's perspective at the time, and recognizing that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Peterson v. Smith,* 510 F. App'x 356, 362 (6th Cir. 2013) (quoting *Strickland,* 466 U.S. at 690). Moreover, the petitioner must also establish that but for this failure to cross-examine; the result of the proceeding would have been different. *Id.* (citing *Strickland,* 466 U.S. at 694).

The evidence before the TCCA established that the petitioner's trial counsel, Adam Parrish, cross-examined Hardy and Foster and attempted to impeach their testimony by establishing that they made inconsistent and contradictory statements to law enforcement investigators. (Post-Conviction Hearing Transcript ("P.C. Tr.") at 59, 87.) Additionally, Parrish testified that he cross-examined Hardy on the threats law enforcement officers made to ensure that he appeared and testified at trial. *Id.* at 59. Moreover, even if the petitioner could establish that his trial counsel was ineffective for failing to more robustly cross-examine Hardy and Foster, given the state of the evidence at trial, including the petitioner's three confessions, he cannot establish that his failure had any prejudicial effect on the outcome of the proceeding. Courts may approach the Strickland analysis in any order, and an insufficient showing on either prong ends the inquiry. *Strickland,* 466 U.S. at 697.

(1)(b) Failing to Interview Witnesses

The petitioner argues that his trial counsel was ineffective for failing to interview Megan Bartlett, Leah Mendoz and Antonio Hardy regarding threats made by law enforcement officers to ensure that they appeared and testified at trial.

Respondent argues that the petitioner procedurally defaulted this claim. The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that the petitioner could show cause and prejudice for that default. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, supra,* 466 U.S. at 690–691. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052. But "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691.

Parrish testified that he spoke with Medoza "at length" prior to trial. (P.C. Tr. At 58.) Parrish did not testify about any pre-trial conversations he did or did not have with Hardy and Foster, however, it was clear that he had the statements they gave to investigating law enforcement officers which would, and did, allow him to cross-examine Hardy and Foster as to inconsistencies in their stories. (*Id.* at 87)

With respect to threats made by law enforcement, Bartlett did not testify that she was threatened, and Parrish cross-examined both Hardy and Mendoza about the threats they received. (Tr. III at 217; 226-27.) Neither Hardy nor Mendoza testified that the alleged threats were intended to garner specific testimony, but rather to ensure that they appeared and testified at trial. (*Id.*) "[A] threat of arrest or prosecution may be coercive, . . . only where the threat could not have been 'lawfully executed.'" *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003). Even taking as true that Hardy and Mendoza were threatened with jail if they did not appear, that threat could have been "lawfully executed." *See* 28 U.S.C. § 1826 (providing that witnesses who fail to comply with "an order of the court to testify . . . may [be] confin[ed] at a suitable place until such time as the witness is willing to give testimony . . ." or the court proceedings have concluded. Thus, the petitioner has not met his burden of establishing that his counsel was ineffective.

Moreover, even if the petitioner could establish that his trial counsel was ineffective for failing to conduct pre-trial interviews with Hardy and Foster, he has not established that counsel's failure to do so had any prejudicial effect on the outcome of the proceeding. *Strickland*, 466 U.S. at 697.

(2) Failure to Object to Blood Spatter Testimony

The petitioner argues that his trial counsel was ineffective for failing to object at trial to TBI Agent Jason Locke's testimony regarding the blood spatter evidence. The TCCA considered and rejected this claim, stating:

> At the post-conviction hearing, trial counsel stated that he would have "clearly objected" if Agent Locke had offered "some kind of scientific conclusion that [was] based upon the trajectory of this blood spatter[.]" At trial, Agent Locke testified that the blood spatter on Mrs. Waller's legs appeared to be going in a downward direction, indicating to Agent Locke that "the entrance wound would have been elevated at the time the blood came, that the wound would have been from the top in a downward direction." However, in addition to Agent Locke's testimony, Dr. Gerber, who was accepted as an expert in forensic pathology, testified that the bullets travelled in a downward trajectory through Mrs. Waller's brain. Therefore, the Petitioner has failed to prove that he was prejudiced by trial counsel's failure to object to Agent Locke's testimony about the blood spatter

*Johnson*, 2015 WL 9581560, at *14.

Even if the petitioner's trial counsel's performance was deficient in failing to object to Agent Locke's blood spatter testimony, counsel is constitutionally ineffective only if his deficient performance caused the defendant to lose what he "otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). The core inquiry remains "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

As the TCCA noted, even if Agent Locke had not testified regarding the "downward position" of the blood spatter, (Tr. III at 194), the jury would still have heard from the State's expert witness, Dr. Gerber, who testified regarding the downward trajectory of the bullets. Specifically, Dr. Gerber testified that the victim had a bullet entry wound at the top of her head, that the bullet entered the victim's head but did not exit, that the bullet traveled downward, backward and leftward through the brain and was found lodged at the base of her brain on the left side. (Tr. III at 257-58.) Additionally, Dr. Gerber testified that the victim had another bullet

wound on the left front of her head, about three inches below the top of her head, and that this bullet traveled from front to back, rightward and downward. (*Id.* at 260-63.) Finally, a number of photographs of the victim as she was found on September 17, 2002, and of the blood spatter at the scene, were admitted into evidence. . (Exh. at 36-50.) Thus, the jury was able to draw its own conclusions about the position, and the significance, of the blood spatter evidence. Under the circumstances present here, the state court's decision denying relief was not an unreasonable application of *Strickland*.

### (3) Failure to Test Hair for DNA

The petitioner argues that his trial counsel was deficient for failing to test the hair found in the victim's hand for DNA evidence. The TCCA considered this claim and rejected it crediting trial counsel's testimony that he made a strategic decision not to test the hair. *Johnson*, 2015 WL 9581560, at * 15. At the hearing on the post-conviction petition, trial counsel explained that it was obvious the hair did not belong to the petitioner, so if the hair was not tested to determine to whom it belonged, counsel could ethically argue, consistently with the defense strategy of trying to place the blame for the victim's murder on her husband, that the hair belonged to Jason Waller. (P.C. Tr. At 78-80.) Trial counsel's decision to not test the hair for DNA evidence was a reasonable strategic decision which this court may not second-guess. *See Strickland*, 466 U.S. at 689; *Jackson v. Bradshaw*, 681 F.3d 753, 760 (6th Cir. 2012).

### (4) Failure to Object to the Comments about Petitioner's Failure to Testify

The petitioner argues that his trial counsel was ineffective for failing to object or move for a mistrial when Agent Locke made the following comment during cross-examination:

> Q: Okay. So basically all we have to say that [the petitioner's typewritten statements] are in fact just as you say they are is your word against [the petitioner's], is that correct?

A: They contain his signature. I'm sure he could take the stand and say that he didn't sign it, but –

(Tr. II at 200).

The TCCA considered and rejected this claim as follows:

> The State concedes that Agent Locke's comment was improper. However, the State contends that trial counsel's performance was not deficient because, at the time Agent Locke made the comment, trial counsel believed that the Petitioner was going to testify at trial.
>
> Trial counsel testified that the Petitioner's testimony was a crucial part of the defense theory that Mr. Waller actually committed the murder. At the time Agent Locke made the challenged comment, trial counsel believed that the Petitioner would take the stand and testify that he had an eighth-grade education and that he did not make the statements to police freely and voluntarily. The Petitioner claims that he told trial counsel that he did not want to testify before the trial. However, trial counsel recalled that the Petitioner told trial counsel he was not going to testify on the last day of trial—the day after Agent Locke testified —and the post-conviction court credited trial counsel in its order denying post-conviction relief. As such, trial counsel made a tactical decision not to object based on a valid, informed trial strategy, which we will not question. *See Granderson,* 197 S.W.3d at 790. The Petitioner has failed to prove that trial counsel was deficient for failing to object to Agent Locke's comment or move for a mistrial because, at the time it was made, trial counsel believed that the Petitioner would testify. The Petitioner is not entitled to relief on this issue.

*Johnson*, 2015 WL 9581560, at *16-17.

Trial counsel's testimony at the post-conviction hearing was as follows:

> Q [post-conviction counsel]: Because you believed at the time Mr. Johnson was going to testify, you did not object to that statement and didn't ask for a curative instruction or anything of that nature?
>
> A [trial counsel]: That's correct. My plan was, hey, you know, they want to hear from him, here he is. He's going to take the stand, and he's going to testify.
>
> Q. But you had to know, Mr. Parrish – you'd had several jury trials before. You had to know that there was a chance he might not.

A. All I can say is based upon all the meetings I had with Mr. Johnson and after the motion to suppress [was denied], the only trial strategy that we could legitimately put forth is, we know these statements are out here, we can't pretend they don't exist, they clearly exist, but don't give them any credit because you need to understand why. The best trial strategy that we could come up with at that point was, he's the guy who did it –her husband is the one who did it. He's the one, who has done it, and my client has been taken in and coerced or scared – he was a very young man at that time that he was either coerced or he made these statements unwilling or just signed something that he didn't really understand. That was our trial strategy up until it fell apart the last day of trial.

Q. And in order to follow through with that trial strategy, you had to have Mr. Johnson's testimony?

A. Yes, sir.

(P.C. Tr. at 68-69.)

Trial counsel's strategy to not object to Agent's Locke's statement or move for a mistrial was reasonable given that he believed that the petitioner would testify to explain the circumstances that led him to sign three separate statements confessing to murder. Moreover, even if at the time of Agent Locke's testimony, petitioner had already advised counsel that he would not testify, the failure of counsel to object under the circumstances present here would not, by itself, render counsel's performance ineffective.[4] *See Lundgren v. Mitchell,* 440 F.3d 754, 774–75 (6th Cir. 2006) (recognizing that "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state.") The state court's decision denying this claim was not an unreasonable application of *Strickland.*

(5) <u>Failure to Object to the State's Closing Argument</u>

---

[4] Moreover, although the petitioner and counsel disagree about the timing of the petitioner's decision not to testify at trial, the petitioner testified at the post-conviction hearing that his trial counsel advised him that it was in his best interest to testify, and that it was the petitioner's decision, and his alone, not to testify at trial. (P.C. Tr. at 125.)

The petitioner argues that his trial counsel was ineffective for failing to object to comments the prosecutor made in closing argument regarding: (a) proof that the fetus was viable; (b) the victim's posture and statements she allegedly made before she was shot; and (c) his alleged statement to Agent Locke that he "shot the bitch." [5]

The TCCA rejected this claim, stating, in pertinent part:

> [T]he Petitioner argues that trial counsel should have objected during the State's closing argument when the prosecutor stated that Mrs. Waller was on her knees, begging for her life, when she was shot. The Petitioner contends that such argument was improper because "[t]here was not testimony that Mrs. Waller was squatting down begging for her life as there were no eye witnesses to the shooting[.]" However, trial counsel recalled that there was evidence that Mrs. Waller was shot while she was on her knees. Further, at trial Agent Locke testified that the blood spatter pattern on Mrs. Waller's pants indicated that her pants were riding up and causing "ruffles" which prevented the blood for staining portions of Mrs. Waller's pants. Such pattern indicated to Agent Locke that Mrs. Waller was squatting or kneeling at the time she was killed. The conclusion that she was begging for her life was a permissible inference from the proof presented at trial. The Petitioner has failed to prove that trial counsel was deficient for failing to object to the prosecutor's comment that Mrs. Waller was kneeling and begging for her life.
>
> Finally, the Petitioner claims that trial counsel should have objected to the State's closing argument when . . . the prosecutor claimed that the testimony about the baby's viability was "uncontradicted" . . . However, no proof was presented about these comments during the post-conviction hearing, and the Petitioner did not ask trial counsel why he failed to object to them. As such, the Petitioner has failed to prove that trial counsel was deficient for failing to object to these comments.

*Johnson*, 2015 WL 9581560, at *17-18.

Deference to counsel's tactical decisions during closing argument are "particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). The petitioner can establish that he received ineffective

---

[5] To the extent that the respondent argues that any of these grounds for relief are procedurally defaulted, the court concludes that the procedural default issue raises more questions than the claim on the merits, and thus, considers this claim on the merits. *See Lambrix,* 520 U.S. at 525.

assistance of counsel if he shows that counsel's failure to object was "both objectively unreasonable and prejudicial." *Schauer v. McKee*, 401 Fed.App'x. 97, 101 (6th Cir. 2010). However, counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004). Moreover, a single failure to object to closing arguments usually cannot be said to have been error. Defense counsel must so consistently fail to use objections, despite clear reasons for doing so, that counsel's failure to object cannot reasonably have been said to be trial strategy. *Bradshaw*, 591 F.3d at 522.

The petitioner's post-conviction counsel never specifically asked trial counsel why he did not object to any of the comments the prosecutor made in closing argument. Nevertheless, trial counsel's testimony at the evidentiary hearing suggests that trial counsel believed that there was sufficient evidence before the jury to support the statements the prosecutor made in his closing argument.

**(a) Viability of the Fetus -** The petitioner claims that trial counsel was ineffective for failing to object to the prosecutor's comment that uncontroverted testimony established that the victim's fetus was viable. It bears noting that the trial court instructed the jury that a "[v]iable fetus, means that a state of development has been achieved wherein it could be reasonable- - wherein it could be reasonably expected to be capable of living outside the uterus." Tr. V at 377. In other words, the jury was instructed by the court that the prosecutor's comment that the fetus was viable was not synonymous with the prosecutor saying the fetus would certainly have lived.

At the post-conviction evidentiary hearing, trial counsel testified that he did not think it was necessary to obtain an expert to testify regarding the fetus' viability because although Dr.

Gerber testified at trial that the fetus was viable, on cross-examination Dr. Gerber conceded that there was no way to determine if the fetus would have survived, Tr. III at 273, and trial counsel understood that there was no way any doctor could "conclusively testify beyond a reasonable doubt, even on expert medical opinion, that a child weighing 500 grams at that early phase of its life could have conclusively survived. There was just no way to testify to that."  (P.C. Tr. at 75.) Counsel's decision not to object to the prosecutor's comments in closing that the fetus was viable was a reasonable strategic decision based on the circumstances present here.  *Bradshaw,* 591 F.3d at 522 (finding counsel was not deficient for failing to object, and thereby draw attention to, the prosecutor's comment.)

(b) **Position of Victim -** The petitioner claims that trial counsel was ineffective for failing to object to the prosecutor's comments in closing argument about the victim's position when she was shot and inferences that the jury might make based on her position.  At the post-conviction evidentiary hearing, trial counsel testified that:

> I do believe that there was some indication that was consistent with that, specifically as of an execution.  I can't recall if it came from my personal interviews with the TBI expert or if it came out during cross-examination. There was indication that based upon the trajectory of the bullet, it was a .45 round that went literally -- or a round, whatever caliber -- I apologize, I don't recall.  It came literally straight through the top of the body and there was, I think, some indication that she was either on her knees, in that position, at the time this second shot was fired down through the top of her head.  Additionally, there was evidence on her body of stippling – for lack of a better word, gun powder burns of a weapon being fired at very, very close range to the flesh, and I think the depiction either from the doctor or my interview was that there was a hand up based upon the stippling that appeared on her arms.  It was consistent with her arms being up like, no, at the point the weapon was fired the second time.

(P.C. Tr. at 71.)  Consistent with trial counsel's testimony, the evidence at trial established that the victim was shot in the top of her head and in her forehead just inches from the top of her head

from a range of 6 to 24 inches, that stippling on her arm was consistent with her holding her arm up and that the blood spatter suggested she was in a kneeling or squatting position. (Tr. III at 257-263; Tr. II at 193-95, Exh. at 36-50) Undoubtedly, the jury had sufficient evidence from which to come up with its own conclusions about the circumstances immediately preceding the victim's death. In light of the evidence presented at trial, trial counsel was not ineffective for failing to object to the prosecutor's comments regarding the victim's position and statements she might have made before she was killed.

Moreover, even if trial counsel was deficient, the petitioner does not suggest how trial counsel's deficiency was prejudicial. The trial court instructed the jury that:

> The attorneys have made their closing statements, arguments and remarks. These were made to help you to understand and apply the evidence to the law. What the attorneys have said to you is not evidence, and you cannot rely on their statements to you as evidence. The only evidence you are to consider is the sworn testimony given in open court along with the trial exhibits that I have allowed to be exhibited in evidence before you. If any statements were made by the attorneys that you believe are not supported by the evidence you should disregard them.

(Tr. VI at 364.) The court must presume the jury heeded this instruction, *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009). Thus, the jury was free to conclude that the prosecutor's statements were not supported by the evidence and were, thus, not to be believed.

**(c) The Petitioner's Comment -** Trial counsel was likewise not ineffective for failing to object to the prosecutor's argument that the petitioner said "I shot the bitch" because Agent Locke testified at trial that the petitioner made this statement. *See Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (noting that "[a]dvocates have an obligation to . . . put forth only proper arguments based on the evidence in the record." (citation omitted). Moreover, it is worth noting, that trial counsel repeated this phrase several times in his closing when arguing that Agent

Locke's testimony should not be believed.  *See* Tr. III at 352.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Bradshaw*, 591 F.3d at 523.

In sum, the state court's determination that trial counsel was not deficient for failing to object to comments the prosecutor made during his closing argument was not objectively unreasonable and did not result in a decision that was contrary to clearly established federal law. 28 U.S.C. § 2254 (d)(1).

(6) <u>Evidence to Refute Viability and Preservation of Issue on Appeal</u>

The petitioner argues that his trial counsel was deficient for failing to offer evidence to establish that the fetus was not viable and he faults his appellate counsel for failing to preserve this issue for appeal.

The TCCA considered and rejected this claim, as follows:

> The Petitioner argues that trial counsel was ineffective for failing to present expert testimony that a fetus "weighing 500 grams (less than one pound) at that stage in the pregnancy [twenty-three to twenty-four weeks] could not have survived outside the womb[.]" The Petitioner contends that Dr. Li's deposition testimony highlighted "huge problems" in Dr. Gerber's trial testimony and that it showed trial counsel should have called a defense expert at trial.  Specifically, the Petitioner notes that Dr. Li incorrectly assumed that Dr. Gerber relied on Mrs. Waller's clinical history when he formed his opinion about the viability of the fetus, but such history was not part of Dr. Gerber's file.  At trial, Dr. Gerber admitted on cross-examination that the fetus was at the edge of viability and that "it could have survived, it could not have survived."  In his deposition, Dr. Li agreed with Dr. Gerber's assessment that the fetus was at the margin of viability and stated that it was not possible to determine whether any one individual fetus was viable because there were too many variables.  It is true that Dr. Gerber and Dr. Li came to different conclusions as to the fetus's viability.  However, both agreed that Mrs. Waller's fetus was on the margin of viability and that there was no way to definitely determine whether it was viable. Accordingly, the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to call a defense expert witness to testify about the viability of the fetus.

> Additionally, the Petitioner argues that appellate counsel was ineffective for failing to "fully" raise and argue on appeal the issue of sufficiency of the evidence concerning the viability of the fetus. However, the Petitioner does not explain what appellate counsel should have argued on appeal as to this issue. Further, this court specifically addressed the sufficiency of the evidence concerning the viability of the fetus and determined that there was sufficient evidence to support the Petitioner's conviction for second degree murder. *Jason Curtis Johnson,* 2006 WL 407767, at *12–13. The Petitioner has failed to show that appellate counsel was deficient or that he was prejudiced by appellate counsel's omission.

*Johnson*, 2015 WL 9581560, at *188.

Trial counsel's cross-examination of Dr. Gerber at trial and Dr. Li at his deposition established that neither physician could testify conclusively regarding whether the victim's fetus would have survived outside the womb. (Tr. III at 273; Exhibit 1 to the P.C. Tr. at 30, ECF No. 15-16.) The petitioner fails to suggest what other evidence or testimony his counsel could have offered to underscore this point. Additionally, the petitioner's appellate counsel testified at the post-conviction evidentiary hearing that he raised all claims he believed were meritorious and supported by the evidence, and he did not believe "that there was any issue I could cite to in the record related to the sufficiency [of the evidence regarding the viability of the fetus]. P.C. Tr. at 14-15. The state court's rejection of this claim was not unreasonable.

### E. Cumulative Error.

The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review. "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d

416, 447 (6th Cir. 2002). Finally, because the individual grounds for relief raised by the petition are without merit, the petitioner cannot show that the cumulative error violated his constitutional rights. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

## VI    CONCLUSION

For the foregoing reasons, the habeas corpus petition will be denied and this matter dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district court judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different matter or that the issues presented were "adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).)

In this case, the issues raised in the petition do not merit further review. Thus, the Court will deny a COA. The petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE